UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR EMMANUEL MALDONADO,<br><br>                           Petitioner,<br>vs.<br><br>M. STAINER, Warden,<br><br>                           Respondent. | CASE NO. 11cv2768 DMS (MDD)<br><br>REPORT AND RECOMMENDATION RE: PETITION FOR WRIT OF HABEAS CORPUS |

**I.  INTRODUCTION**

       This Report and Recommendation is submitted to United States District Judge Dana M. Sabraw pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72 of the United States District Court for the Southern District of California.  After reviewing the Petition (Doc. No. 1.), Respondent's Answer and Memorandum of Points and Authorities in support thereof (Doc. No. 5.), and the supporting documents and pertinent state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

**II.  PROCEDURAL HISTORY**

       On November 28, 2011, Omar Emmanuel Maldonado ("Petitioner"), a California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in Custody pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his January 20, 2009 conviction of first degree murder (count 1) and assault with a firearm (count 2). (Doc. No. 1.)  In the request,

Petitioner alleges that the trial court erroneously: (1) discharged a juror during deliberation; and (2) failed to answer the jury's request for clarification. (Doc. No. 1.)

Petitioner properly exhausted his claim at the state level, with the California Court of Appeal (fourth appellate district) denying relief on the merits on May 25, 2010, and the California Supreme Court denying review on September 1, 2010. (Lodgment Nos. 6–8.) On January 27, 2012, M. Stainer, Warden of California Correctional Institution, Tehachapi, California ("Respondent") filed an Answer. (Doc. No. 5.) Petitioner filed his Traverse on March 28, 2012. (Doc. No. 12.)

### III. STATEMENT OF FACTS

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see also Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings.")). Accordingly, the following facts are taken from the California Court of Appeal's opinion:

> On February 15, 2000, Maldonado, who was 17 years old and a gang member, was a passenger in a vehicle when a rival gang member shot a BB gun into a back window of the car. Shortly after, Maldonado returned to the scene, pulled out a shotgun, and ran toward a group of people on the sidewalk. As the people ran away, Maldonado discharged one shot from the shotgun, hitting victim Eduardo Ayala with pellets in the hand and leg.
>
> On the next evening, Maldonado and several other young people were in a bedroom listening to music, talking and "smoking weed." Seventeen-year-old Leah Tadeo was also in the bedroom. Maldonado was angry because of an earlier incident when someone had crossed off his name from a gang roster list written on a bathroom mirror. At some point, Maldonado pointed an unloaded gun to the back of Tadeo's head. Tadeo told Maldonado to get the "fucking gun" away from her head. Maldonado's face turned red, as if he were humiliated. Maldonado then passed the gun to his friend, who put a bullet in the gun.
>
> Shortly after, Maldonado grabbed the loaded gun back from his friend. With a "mad look" on his face, Maldonado immediately pointed the gun at the back of Tadeo's head. Tadeo again told Maldonado "Get that fucking gun out of my face." Seconds later, Maldonado fired the gun into Tadeo's head. Tadeo died shortly after. Maldonado quickly left through a window and fled to Mexico.
>
> About seven years later, Mexican authorities apprehended Maldonado. San Diego police then took custody of Maldonado, and he was charged as an adult with crimes relating to the Ayala and Tadeo incidents.
>
> At trial, Maldonado testified on his own behalf. With respect to Ayala, Maldonado admitted he shot the gun, but claimed he intended only to break the windows of a car on

the street. Maldonado denied he was a gang member at that time.

With respect to the Tadeo shooting, Maldonado admitted shooting Tadeo in the back of her head, but said he did not think the gun was loaded and claimed the shooting was accidental.

On the Tadeo count, the jury was instructed on first and second degree murder, voluntary and involuntary manslaughter, and accidental homicide. On the third day of deliberations, the court dismissed a juror based on the court's finding that the individual could no longer fulfill the functions of a juror, and selected a replacement juror. The next afternoon, the jury returned verdicts of guilty on the first degree murder and assault charges.

(Lodgment No. 6, p. 2–3.)

## IV.  STANDARD OF REVIEW

Title 28, United States Code, § 2254, subsection (a) provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The Petition was filed after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C. § 2254 subsection (d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### A.   Clearly Established Federal Law

When determining what constitutes "clearly established federal law" under § 2254(d)(1), federal courts look to United States Supreme Court holdings at the time of the state court's decision. *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). A state court's decision is "contrary

to" clearly established United States Supreme Court precedent if (1) the state court applies a rule different from the governing law set forth in Supreme Court cases, or (2) the state court confronts a set of facts that are materially indistinguishable from a Supreme Court case, but still reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06, 412 (2000); *Lockyer*, 538 U.S. at 73; *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003) (overruled in part on other grounds by *Lockyer*, 538 U.S. 63). A state court decision does not have to cite to or even demonstrate an awareness of clearly established Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradict such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

### B.  Unreasonable Application of Federal Precedent

A state court decision may involve an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. Alternatively, an unreasonable application may be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer*, 538 U.S. at 76. Instead, the state court's application must be "objectively unreasonable." *Id*. Petitioner bears the burden of proving the state court acted in an unreasonable, or contrary manner. *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).

### C.  Unreasonable Determination of the Facts

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not suffice. *Miller-El*, 537 U.S. at 340. Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented

in the state-court proceeding." *Id.*

D.      **"Look-Through" Doctrine**

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision. *Y1st v. Nunnemaker*, 501 U.S. 797, 801–806 (1991); *Van Lynn v. Farmon*, 347 F.3d 735 (9th Cir. 2003). When the state court does not supply reasoning for its decision, an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This independent review is not *de novo*. *Id*. Although the federal court independently reviews the record, it defers to the state court's ultimate decision. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

## V.  DISCUSSION

Petitioner asserts that he is entitled to federal habeas relief because (1) the trial court improperly discharged a juror during deliberation, thereby violating petitioner's constitutional right to a jury of his choosing under the Due Process Clause and the Sixth Amendment; and (2) the trial court erroneously failed to respond to a jury question seeking clarification. Where a state court has issued a reasoned decision explaining why it denied a petitioner's claims for relief, the reviewing court must accord substantial deference to that decision and decide only whether it was contrary to, or resulted in an unreasonable application of, firmly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented. *Lockyer*, 538 U.S. at 75.

A.      **Dismissal of Juror**

In Claim One, Petitioner agues that the trial court's dismissal of Juror No. 1 during deliberations violated his constitutional right to due process and a jury of his choosing. (Doc. No. 1, p. 6; Document No. 12, p. 2).

   *1.      Relevant Background*

The following facts are taken from the California Court of Appeal's opinion:

> After the jury was seated and shortly before opening statements, on Wednesday October 22, the court and both counsel met with Juror No. 1, who had requested to speak to the court. Juror No. 1 initially asked whether he would be able to attend a parent/teacher conference at his son's school in about nine days. The court responded by

assuring the juror that he would be able to attend the conference, and told the juror to remind the court about the appointment next week. When the court asked whether that was the juror's only concern, the juror responded "I'm just having . . . a little personal issue about having to decide this man's fate." He said: "I've had a lot of stress divorcing my wife, raising my son on my own. This is more stress, you know, to have to make this kind of . . . serious decision. So I'm having trouble with it."

The court then asked counsel whether they wished to question Juror No. 1 or whether they would prefer to give him "a day or two" to see how he was doing. Defense counsel suggesting [sic] waiting a few days to see whether the juror felt he could handle being a juror in the case. The prosecutor said he wanted to briefly question the juror. During that questioning, Juror No. 1 repeatedly made clear he would prefer not to have to make a decision in the case, but agreed he thought he was capable of listening to the evidence and could make a fair decision if he was required to do so.

The prosecutor then said, "Unless [the juror] decides [he is unable to perform his duties] on a future day, I think we're okay." The court told the juror, "So let's give it a couple of days. [¶] . . . [¶] . . . See how you do. If I don't ask you on Friday, you remind me that we need to talk, okay?" After the juror exited, the court stated, "I think letting him try a couple of days will be the best approach, and then if he's not comfortable, you two will have to figure out how you want to handle it." Defense counsel indicated his agreement with this approach.

The following Monday, on October 27, at the end of the day, Juror No. 1 indicated he wanted to speak to the court and counsel. The following then occurred:

"The Court: Hi. Welcome back . . . . Are you feeling okay?

"Juror No. 1: Not really.

"The Court: Okay. . . . [¶] . . . So can you explain to me a little bit more about how you're feeling?

"Juror No. 1: It's just that I feel a lot of pressure about making the decision, and I don't feel like I'm up to it.

"The Court: Do you think you would be unable to give the defendant a fair trial if you were to stay on the case because of the pressure?

"Juror No. 1: I don't know. It's hard to say.

"The Court: [Defense counsel], any questions?

"[Defense Counsel]: Do you feel that the emotions that you're feeling would affect the way you look at the evidence . . . when you're in with the rest of the jury and that you would be unable to come to a decision in the case?

"Juror No. 1: I think it would be hard to come to a decision.

"[Defense Counsel]: Well, unfortunately, there's a lot of things that are hard, but we're all asked to do certain things. Do you feel that you just could not come to that decision?

"Juror No. 1: I just feel a lot of stress about having to make the decision on the jury.

| | |
|---|---|
| 1 | "[Defense Counsel]: I don't have any further questions |
| 2 | [¶] . . . [¶] |
| 3 | "[Prosecutor]: Would that stress interfere with your ability to deliberate with the other jurors? |
| 4 | |
| 5 | "[Juror No. 1]: No, I could deliberate with them. I'd have to make a decision at some point. |
| 6 | "[Prosecutor]: Do you think the pressure of deliberations would be too much for you personally, your mental makeup? |
| 7 | |
| 8 | "[Juror No.1 ]: I think it's just hard to determine his fate. |
| 9 | "[Prosecutor]: If it's just hard, that's one thing. If all of these things put together are going to make it beyond hard and are really going to make it to where you can't objectively apply the law and fairly, to everybody, do the job of a juror—that's what we are trying to figure out. Does that make sense? |
| 10 | |
| 11 | "Juror No. 1: Yeah. |
| 12 | "[Prosecutor]: Do you think you could make a decision without letting emotion and sympathy get in the way? |
| 13 | |
| 14 | "Juror No. 1: Yeah, I think I could. |
| 15 | "[Prosecutor]: Okay. Do you think you can make the decision fairly to both parties? |
| 16 | "Juror No. 1: Well, there's a lot of information to digest, and I wasn't at the scene. So I can't know for sure who is lying and who is telling the truth. That's where I'm struggling. |
| 17 | |
| 18 | "[Prosecutor]: Are you willing to do the job of a juror which is to listen to all, as you have been, discuss with others, and to reach a decision. [¶] Are you willing to do that job? |
| 19 | |
| 20 | "Juror No. 1: I think it's going to be hard for me. |
| 21 | "[Prosecutor]: I understand it's going to be hard. What I'm trying to figure out is if it's going to be so hard that the hard is going to interfere with you actually doing the job. |
| 22 | |
| 23 | "Juror No. 1: I'm not sure. |
| 24 | "[Prosecutor]: Do you think it might? |
| 25 | [¶] . . . [¶] |
| 26 | "Juror No. 1: Hopefully, it would not. [¶] . . . [¶] . . . I think it's going to be a hard decision. |
| 27 | "[Prosecutor]: Are you losing sleep over this. [sic] |
| 28 | "Juror No. 1: I am stressing out about it somewhat. |

"[Prosecutor]: Are you going to be able to make a decision without sympathies, passions or anything outside of the trial getting in your way?

"[Juror No. 1]: I don't know. It's going to be a hard decision. I can't tell who is lying. It's hard to tell who is lying and who it telling the truth.

"[Prosecutor]: Are you going to be able to give us your independent individual opinion in the [jury] room?

"Juror No. 1: Yeah, I can try. Yes. Yeah, I can give my opinion. Yes.

"[Prosecutor]: Are you wanting to be excused? Are you wanting to not be a juror?

"Juror No. 1: I just, unfortunately, don't feel comfortable, you know being—making the decision here if it came down to me. That's where I'm struggling.

"[Prosecutor]: And if it came down to you, could you do that?

"Juror No. 1: If I was on the jury and I'd have to, then I'd have to. It's just a hard decision that I've never had to do before.

The court then asked Juror No. 1 whether he could be a fair and impartial juror. The juror responded that he "would definitely try to be fair and impartial." The court then asked: "Do you think you're going to be able to make a decision?" Juror No. 1 replied, "That's where I'm struggling." The court then inquired whether the pressure is going to create such a problem that the juror would not be able to be "fair and impartial," and whether he could "handle the stress . . . ." The juror responded, "Well, I wouldn't be bringing it up if it wasn't a problem for me." The juror also said "I would always try to be fair. I just . . . wish I didn't have to make the decision. That's where I'm at."

The court then asked the juror to step outside, and asked counsel for their positions. Defense counsel said, "I don't think there's sufficient cause to excuse him." The prosecutor stated: "It's clear that he's having a lot of difficulties. He keeps raising this day after day that he's not sure he's going to be able to do the job of a juror, and he even told us multiple times today that he's not sure he's going to be able to do the job of a juror or [that] he's going to be able to be fair. He says he'll try. I think we need to hear from him tomorrow when he thinks about this before we reach a final conclusion on it."

The court responded, "Unless he's willing to say he can't be fair and his only problem is 'I don't want the pressure or stress of making this decision,' he's going to stay. I don't see any other option unless . . . the two of you decide to stipulate to excusing him." The court then informed Juror No. 1 that he should return the next day, and he could ask to speak with the court again.

The next day, on October 28, at about 3:00 p.m., the jury began deliberations. About two hours later, the jury asked for a reread of a witness's testimony. The next day, on October 29, the jury asked for a readback of another witness's testimony (the individual who loaded the gun shortly before Maldonado shot Tadeo). The next day, on October 30 at about 10:00 a.m., the jury sent another note, asking for additional information about the terms "premeditation" and "deliberation."

Two hours later, possibly during a lunch break, Juror No. 1 called the court's phone number and reached the court clerk. The clerk reported the call to the trial judge on a written note, which stated:

> "The department phone number rang . . . . The calle[r] asked to speak to the judge. I responded that you were not available but I would take a message. I asked who was calling and what was the nature of the call . . . . The calle[r] said, 'This is juror #1 (on the Maldonado trial) and asked to speak to the judge.' I told him that you were not available and that if he wants to communicate with you, he should do so by writing a note. He wanted you to know that: He is too stressed to (for a) conviction on 1st degree. I told him I would give you the message but that he should submit the message in writing. I told him this message would be provided to the attorneys as well."

The court gave both counsel a copy of the note, and about two hours later, the court and counsel met to discuss Juror No. 1's most recent communication. At the outset, the court stated that Juror No. 1 had not put his concerns into writing, but both counsel agreed that the court should bring in the juror to discuss the issues raised by his call. Once he was brought into the courtroom, Juror No. 1 confirmed the accuracy of the clerk's note. The court then cautioned the juror not to discuss the deliberative process, and Juror No. 1 responded, "I did already say what count I was having trouble with." The following colloquy occurred:

> "The Court: Do you feel that you can continue?
>
> "Juror No. 1: I think my emotions are clouding my judgment on that count.
>
> "The Court: Okay.
>
> "Juror No. 1: I couldn't fall asleep last night. Every time I started thinking about that count, for some reason my heart starts racing. For some reason I can't rationalize it to get through it.
>
> "The Court: Do you feel that because of that you're not able to evaluate the evidence?
>
> "Juror No. 1: Yeah.
>
> "The Court: Do you believe that you can be a fair juror?
>
> "Juror No. 1: I don't think I can. I can't come to a conclusion on it.
>
> "The Court: Okay. I want you to be a little cautious here because if it's that you can't vote a particular way and you think you should, that's . . . one issue. [¶] But if it's just that you can't go along with the majority, you're not supposed to necessarily just go along with the majority just because the other juror's think a particular way. [¶] Am I clear in what the distinction is?
>
> "Juror No. 1: Yeah, I don't think it's going with the majority. It's about me having an abiding conviction and being able to—I'm just very—I don't want to have to make this decision. I can't. I'm too stressed out about it. About making it. I can't rationalize why. I'm just too stressed out about it. It's not rational. I'm trying to make it rational, but I can't.
>
> "The Court: Counsel, do you wish to inquire at this point?
>
> [¶] . . . [¶]
>
> "[Defense Counsel]: The judge has paraphrased one of the instructions, which indicates that each and every juror has their own individual opinion on each count or each

1  element of the count and should not be swayed from that decision without at least—or
2  they shouldn't just hold onto that position without at least discussing the matter with the
   other jurors tending to either keep that decision or to change it to another decision. [¶]
3  The thing that concerns me is we don't know whether this is something within you or
   whether it's something that's being pressured by other people that are in the jury room.

4  "Juror No. 1: I don't think I'm up to making the decision. That's where I'm at.

5  "The Court: Any decision or a particular decision?

6  "Juror No. 1: First degree.

7  "Defense Counsel: I asked the same question. Any decision either for or against
   or just making a decision period on first degree?
8
9  "Juror No. 1: Well, definitely making the decision for. You do have alternates,
   correct?

10  [¶] . . . [¶]

11  "The Court: Well, alternates are not a panacea and jurors are selected because of
    who they are. And once you were there, we didn't find out about your concern until after
12  we had already let everybody else go. You were already a juror by the time we figured
    out or learned that there was an issue and that's been the problem all along."
13
14  After defense counsel indicated he had no additional questions, the prosecutor
    began questioning the juror:

15  "[Prosecutor]: Do you believe that your inability to make a decision is based on
    your not wanting to, or you're not being convinced by the evidence one way or the other?
16  Is it a lack of wanting to choose or a lack of being convinced?

17  "Juror No. 1: Wanting.

18  "[Prosecutor]: So it's an irrational not wanting?

19  "Juror No. 1: I can't sleep at night. I have to be able to live with it. I'm not
    seeming to be accepting it.
20
    "[Prosecutor]: Okay. Do you believe that [you] at this point in time [are] able to
21  make a decision without passion, prejudice, sympathy, or bias? Can you make a decision
    on all counts without letting those enter into your head?
22
    "Juror No. 1: What do you mean by bias?
23
    "[Prosecutor]: For or against the defendant. Sympathy for or against the
24  defendant. Prejudice for or against the defendant. Can you make the decision completely
    divorcing those issues and looking at the evidence only on all counts.
25
    "Juror No. 1: I don't want the decision on my shoulders. That's what I think is
26  going on.

27  "The Court: No matter which way you would vote you don't want a decision on
    your shoulders?
28
    "Juror No. 1: Well—

"The Court: Is that what you are saying? Is that just voting one way?

"Juror No. 1: Well, it's worst for voting for first degree, but I don't want to vote against and be wrong either. I want to be able to sleep at night.

"The Court: [Defense counsel], any questions?

"[Defense Counsel]: Well, so what you're saying is, is if you voted against first degree, you could probably live with that decision, but if you vote for first degree, you couldn't live with that decision? [¶] Is that a fair statement of the facts?

"Juror No. 1: Am I supposed to answer that?

"The Court: If you can answer that one. We're trying to figure out if it goes both directions or if it's just one direction.

"Juror No. 1: Well the problem is convicting on first degree. I think if it was not convicting, then I wouldn't have much of a problem.

"The Court: You would not have a problem if it was not guilty?

"Juror No. 1: As much of a problem. It's not rational. I don't want to lay awake every night worrying about this. I'm just not up to it for some reason.

"The Court: Is the pressure, though, in both directions no matter which way you vote you don't want to have to vote at all on this as opposed to it's okay to vote one way, but it's not okay to vote the other? Because I'm hearing different things from you. I'm having a hard time making sure I'm clear.

"Juror No. 1: Does it matter?

"The Court: Yes.

"Juror No. 1: I would have to say both.

"The Court: And you understand that you have the right and the responsibility to vote not guilty if you believe that the People haven't proved their case beyond a reasonable doubt?

[¶] . . . [¶]

"Juror No. 1: Yes."

When the questioning was completed, the court admonished the juror not to speak with the other jurors about his discussions with the court. Juror No. 1 responded, "I did say in the jury room that I'm having a lot of stress about the first-degree verdict." After the juror left the courtroom, the prosecutor stated: "I think all of us observed that during these interactions and continuing today, [the juror's] body language is such that he does appear extremely nervous, fidgety, and I think stressed out is an accurate description of how he appears. It does not appear that this is malingering or a fake attempt to get off the jury."

The court agreed the juror "does appear stressed. The way he's putting his . . . head in his hands, his whole mannerism. I do believe that he's stressed over this. I do believe that it is both directions. [¶] In other words, I think he's more—a little bit more

concerned about finding the defendant guilty of murder in the first degree. I also think he's concerned about finding him not guilty as he expressed because if he's wrong—he really seems to be very torn by the whole situation. [¶] So I am comfortable at this point based upon his answers that it is just not a one-way situation even though it may be a little bit stronger for guilty I don't think it is significantly stronger based upon his answers to a series of the questions. [¶] But now the next issue is what we do about it?"

The prosecutor responded: "Ultimately the jury . . . is under the protection of the Court, and you have to be satisfied yourself that removing a juror would be in the interest of justice and appropriate such that you're not removing a juror who just doesn't agree with the others or dealing with the majority pressure. [¶] But I do believe that the record that we have—that the statements he has made accompanied by his body language, accompanied by his repeated requests, and I think his most clearest answer to us—the one that he thought about and really didn't have to mumble about or hedge his answer was that he was feeling stressed in both directions. That he wasn't up to this decision. That he wasn't approaching it rationally. He couldn't explain why, but he just wasn't able to. I do think there's a basis to say that he's unable to deliberate and perform the job of a juror. I think it's appropriate at this time to substitute an alternate." The court then added: "I'm mindful also of the other things he told us about what was going on in his life the last few years. He obviously has been through a lot. And so it's a little bit more understandable taken in that context as well."

After defense counsel stated that he objected to the removal of the juror, the court concluded there was good cause to discharge Juror No. 1 and substitute an alternate juror. The court stated: "I'm interpreting what he's saying, he can't vote either way. He's just too stressed to vote either way."

(Lodgment No. 6, p. 4–16.)

2.   *Analysis*

Petitioner argues that the trial court lacked good cause to dismiss Juror No. 1. (Doc. No. 1-1, p. 19.) The stress Juror No. 1 reported was, according to Petitioner, simply concern over making the right decision. (Doc. No. 1-1, p. 11–12.) The stress was not severe enough to keep him from performing his duties as a member of the jury. (Doc. No. 1-1, p. 20.) Petitioner further argues that Juror No. 1's comments indicate that he was "most probably leaning toward a lesser included offense, if not outright acquittal." (Doc. No. 1-1, p. 20.) "To excuse Juror No. 1 because he was feeling stress was nothing more or less than an invasion of the province of the jury." (Doc. No. 1-1, p. 20, citing *United States v. Garaway*, 425 F.2d 185, 185 (1970). )

In his Answer, Respondent contends that the California Court of Appeal's rejection of Claim One was proper. Respondent cites *People v. Collins* in support of the proposition that good cause exists to dismiss a juror who has appeared to lose "the ability to render an impartial verdict, or where he has doubts about his ability to render one." (Doc. No. 5, p. 18, citing *People v.*

1    *Collins*, 17 Cal. 3d 687, 696 (1976). ) Respondent also argues that despite Petitioner's contention
2    that Juror No. 1 was leaning a certain way, "there is no evidence in the record suggesting that it
3    was Juror No. 1's views on the merits of the government's case that influenced the trial court's
4    decision to remove him." (Doc. No. 5, p. 19.)

5          In his Traverse, Petitioner maintains that the trial court's "presumption" that Juror No. 1
6    was too stressed to perform his duties, is unsupported by the record. (Doc. No. 12, p. 5.)
7    Furthermore, "[t]he record . . . establishes that Juror No. 1 likely found there to be reasonable
8    doubt in the prosecution's case." (Doc. No. 12, p. 6.) Therefore, Petitioner argues that the
9    dismissal of Juror No. 1 during deliberations was based on improper grounds. (Doc. No. 12, p.
10   6.)

11         Petitioner has not cited any clearly established federal law suggesting that the dismissal of
12   a juror after deliberations have commenced violates a defendant's Sixth Amendment jury trial
13   rights. "[And t]he Supreme Court has not specifically ruled on the constitutionality of
14   substituting an alternate juror after jury deliberations have begun." *Claudio v. Snyder*, 68 F.3d
15   1573, 1575 (3rd Cir. 1995). Since the trial court's actions are not contrary to Supreme Court
16   precedent, the following inquiry will focus solely on whether the state court's actions in the
17   instant case amount to a violation of the Petitioner's Sixth Amendment rights.

18         State criminal defendants have a federal constitutional right to a fair and impartial jury.
19   *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). A defendant's Sixth Amendment right to a fair
20   trial is violated when the "essential feature" of the jury is not preserved. *Williams v. Florida*, 399
21   U.S. 78, 100 (1970). California Penal Code section 1089 governs the dismissal and substitution
22   of jurors in California criminal trials. Under section 1089, a juror may be removed from service
23   either before or after final submission of the case if the juror becomes ill, dies, or upon other
24   "good cause." *Id.* The Ninth Circuit has upheld the constitutionality of section 1089, after
25   determining that it "preserved the 'essential feature' of the jury required by the Sixth and
26   Fourteenth Amendments." *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir.), amended, 768 F.2d
27   1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048 (1986). Accordingly, reviewing habeas courts
28   need only decide whether the state court's application under the circumstances violated a

petitioner's Sixth Amendment rights (e.g., whether good cause existed for the dismissal of the juror). *Perez v. Marshall*, 119 F.3d 1422, 1426–28 (9th Cir. 1997).

Section 1089 provides in pertinent part:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall than take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

Cal. Penal Code § 1089.

A state court's factual determination that good cause existed for the dismissal of a particular juror is presumed correct, and must be upheld unless the finding was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(2), (e)(1); *Perez*, 119 F.3d at 1426.

The California Court of Appeal's determination that good cause existed to remove Juror No. 1 was not an unreasonable determination of the facts. Juror No. 1 had voiced concern essentially from the start of the trial about his ability to function as a jury member. (Lodgment No. 6, p. 4.) While the trial court took the situation seriously and allowed both the prosecutor and defense counsel to question Juror No. 1 and discuss any concerns they had, the court was hesitant to remove Juror No. 1 initially. (Lodgement No. 6, p. 4–16.) As the trial progressed however, it became clear that Juror No. 1's personal and emotional issues were seriously impacting his ability to serve.

On three separate occasions—October 22, October 27, and October 30—Juror No. 1 sought an audience with the court and counsel to discuss the constant difficulties he was having. (Lodgement No. 6, p. 4, 5, and 9.) The trial judge was cognizant from day one that dismissing a juror simply because he was experiencing pressure to conform with the majority or had doubts as to the sufficiency of the evidence to support a verdict, was improper. (Lodgement No. 6, p. 11, 21.) Instead, the court took time to painstakingly question Juror No. 1 about what was really at issue, ensuring that any future dismissal would be for good cause. At one point, during the third meeting between the court, counsel and Juror No. 1, the trial judge specifically asked Juror No. 1

1  if he was having difficulties making a decision about first degree either way or just about
2  convicting. (Lodgement No. 6, p. 14)  Juror No. 1 then replied that he was stressed about
3  deciding either way.  (Lodgement No. 6, p. 14).

4  Juror No. 1 continued to voice concern about his ability to decide the issue and repeatedly
5  stated that he was losing sleep and experiencing severe stress.  (Lodgement No. 6, p. 11–12.)
6  Under both federal and California law, a court does not abuse its discretion when it replaces a
7  juror whose ability to deliberate may be affected due to personal circumstances. *Edmonds v.*
8  *McGinnis*, 11 F. Supp. 2d, 427, 432–33 (1998) (holding that the court properly discharged a
9  sworn juror who had a real estate closing in three days, after determining that she might have
10 trouble concentrating during deliberations if she were not excused); *People v. Cleveland*, 25 Cal.
11 4th 466, 474 (2001) (holding that good cause existed to discharge a juror whose emotional state
12 impeded the juror's ability to fairly consider the evidence and deliberate with other jurors).

13  The trial court gave Juror No. 1 multiple opportunities to adjust and continue with the
14 trial. (Lodgement No. 6, p. 4, 5, and 9.)  Not only did the trial court undertake a very detailed
15 inquiry, it repeatedly reminded Juror No. 1 of his "right and responsibility to vote not guilty if
16 [he] believe[d] that the People [had not proven] their case beyond a reasonable doubt."
17 (Lodgement No. 6, p. 15.)  Yet Juror No. 1 still voiced serious doubt regarding his ability and
18 willingness to decide the issue either way.  The trial court followed the correct procedure, as
19 provided in section 1089, when it ultimately replaced Juror No. 1 with an alternate and instructed
20 the jury to disregard prior deliberations and to begin anew. (Lodgement No. 2, p. 912–16.)

21  The California Court of Appeal reasonably found that the record shows, to a demonstrable
22 reality, that Juror No. 1 was unable to perform his duty as a juror and that the trial court had
23 "good cause" to remove him.  (Lodgement No. 6, p. 18, (finding that Juror No. 1's responses
24 showed that he could no longer perform the duties of a juror because he was unwilling or unable
25 to make a decision on the murder charge).) Furthermore, Petitioner has failed to present clear and
26 convincing evidence to rebut the presumption that the California Court of Appeal's holding
27 affirming the trial court's ruling was correct.

28  In light of the foregoing, the California Court of Appeal's denial of Petitioner's claim

regarding the trial court's dismissal of Juror No. 1 was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Therefore, habeas relief is not warranted on this claim and accordingly, the Court **RECOMMENDS** that the Petition for relief be **DENIED**.

### B.     Jury's Request for Clarification

In Claim Two, Petitioner asserts that the trial court erred when it failed to respond to a jury question seeking additional information. (Doc. No. 1, p. 6; Document No. 12, p. 2).

####     1.     Relevant Background

The following facts are taken from the California Court of Appeal's opinion:

> A few hours before Juror No. 1 called the court clerk during deliberations, the jury submitted the following question (Question No. 5) to the court: "Are [] there any further instructions on the definition of premeditation and deliberation available? [¶] Or any help on how to legally interpret the words."
>
> After discussing the question with counsel, the court decided to additionally instruct the jury on the portion of CALJIC No. 8.20 that defines the terms as a pinpoint instruction. Both counsel agreed with this response. The court and counsel then engaged in the extensive questioning of Juror No. 1, and the court decided that there was good cause to remove the juror.
>
> The court then substituted an alternate juror, and instructed that the newly constituted jury should begin the deliberations anew. After the jury was excused, the court and both parties agreed that the previously discussed response to the Jury Question No. 5 would be sent to the jury. The court then addressed the clerk: "I'm going to print a signed copy now. Technology is amazing. That's the signed copy right there. That goes to the jury. [Counsel] have approved it."

(Lodgement No. 6, p. 22–23.)

####     2.     Analysis

Petitioner argues that the trial court prejudicially erred by failing to respond to the jury's question seeking clarification regarding the terms 'premeditation' and 'deliberation'. (Doc. No. 1-1, p. 23.) While Petitioner does not challenge the substance of the original or supplemental instruction, he does argue that there is no proof that the newly constituted jury actually received the supplemental instruction. (Doc. No. 1-1, p. 24.) "Despite the absence of any showing in the record that the instruction actually went to the jury, the [court] concluded that the instruction was given to the jury simply because the [trial judge] told the clerk to do so." (Doc. No. 1-1, p. 24.) In failing to respond to the jury's question, Petitioner asserts that the court "deprived [him] of his

right to due process and to a jury determination of his cause." (Doc. No. 1-1, p. 25.)

Respondent argues that the California Court of Appeal's rejection of Claim Two was neither contrary to nor an unreasonable application of Supreme Court precedent. (Doc. No. 5, p. 20.) Respondent notes that absent evidence to the contrary, the California Court of Appeal must presume that the court clerk delivered the instruction as directed by the trial judge. (Doc. No. 5, p. 21.) Because Petitioner failed to presented any evidence to rebut this presumption, Respondent contends that the California Court of Appeal reasonably concluded that the trial court did not commit error. (Doc. No. 5, p. 22.) Furthermore, Respondent argues that even if the trial court did fail to respond to the jury inquiry, there is no evidence that Petitioner was prejudiced by the error since "there was substantial evidence of [Petitioner's] guilt in the instant case to support his . . . conviction." (Doc. No. 5, p. 22.)

Petitioner argues in his Traverse that the inquiry posed by the jury indicates that at least one juror was questioning whether the prosecution had satisfied its burden of proof. (Doc. No. 12, p. 9.) By failing to respond to the question, the court deprived Petitioner of his right to due process and "to his jury's full and fair deliberation of the evidence." (Doc. No. 12, p. 9.)

A jury instruction that is inconsistent with state law generally does not merit federal habeas relief. *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986). When a federal habeas petitioner challenges jury instructions given in a state criminal proceeding, the only question for a reviewing court is

> whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction . . ., [the reviewing court] inquire[s] whether there is reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. [All the while keeping in mind the Supreme Court's] admonition that [it has] defined the category of infractions that violate 'fundamental fairness' very narrowly. Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.

*Estelle v. McGuire*, 502 U.S. 62, 72–73 (1991). Thus, the "burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgement is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

1  Petitioner's burden in the instant case is particularly great because he does not contend
2  that an erroneous instruction was given. *Id*. Rather his claim of prejudice is based on the court's
3  failure to give an additional explanation—beyond the initial instruction—regarding the terms
4  'premeditation' and 'deliberation'. *Id.* at 155. "An omission, or an incomplete instruction, is less
5  likely to be prejudicial than a misstatement of the law." *Id.*

6  The California Court of Appeal's denial of Claim Two was not contrary to, nor an
7  unreasonable application of, Supreme Court precedent, nor was it an unreasonable determination
8  of the facts. The state court reasonably concluded that there "is nothing in the record showing the
9  trial court failed to respond to the question." (Lodgement No. 6, p. 23.) In addition, "the jury
10 never inquired about an answer, [nor did] counsel object on the basis that the instruction was not
11 given." (Lodgement No. 6, p. 23.) Petitioner has not presented clear and convincing evidence to
12 show the contrary and his bare conclusions will not suffice. *James v. Borg*, 24 F.3d 20, 26 (9th
13 Cir. 1994) (observing that conclusory allegations which are not supported by a statement of
14 specific facts do not warrant habeas relief); *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977)
15 (noting that a petitioner must state facts that point to a real possibility of constitutional error to be
16 entitled to habeas corpus relief). Accordingly, the high hurdle of presumed correctness afforded
17 to the state court's factual determination—that no error was committed—has not been overcome.
18 28 U.S.C. § 2254(e)(1).

19 Furthermore, even if it is assumed that the court failed to deliver the additional instruction,
20 it cannot be said that the omission "so infected the entire trial that the resulting conviction
21 violated due process." *McGuire*, 502 U.S. at 72. The possibility that the jury might have reached
22 a different verdict given the additional instruction—despite the overwhelming evidence indicating
23 Petitioner's guilt—"is too speculative to justify the conclusion that constitutional error was
24 committed." *Kibbe*, 431 U.S. at 157.

25 Accordingly, the California Court of Appeal's denial of Petitioner's second claim for
26 relief was not contrary to, nor an unreasonable application of, clearly established federal law, nor
27 was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Habeas relief is
28 not warranted on this claim and accordingly, the Court **RECOMMENDS** that the Petition for

relief be **DENIED**.

## VI. CONCLUSION

For the reasons stated herein, the grounds for relief asserted by the Petitioner fail. Accordingly **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation and (2) denying Petitioner's petition for writ of habeas corpus.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties no later than **August 9, 2012**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 23, 2012**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

DATED: July 19, 2012

Hon. Mitchell D. Dembin
U.S. Magistrate Judge